# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JANIE WALKER-BARFI,

        Plaintiff,

v.                                                  Case No. 04-C-0973

JO ANNE B. BARNHART, Commissioner of
Social Security Administration,

        Defendant.

## DECISION AND ORDER REVERSING DECISION OF
## AND REMANDING CASE TO THE COMMISSIONER

        Plaintiff, Janie Walker-Barfi, seeks judicial review under 42 U.S.C. §§ 405(g) and § 1383(c)(3) of the Commissioner's denial of her application for Supplemental Security Income benefits. Walker-Barfi suffers from sarcoidosis, which is a systemic disease characterized by the presence of a cluster of small, nodular cells or lesions in organs or tissue, especially the lungs, but also the lymph nodes, skin, liver, spleen, eyes, and certain bones and glands. *Stedman's Medical Dictionary* 768, 1593 (27th ed. 2000). In addition, Walker-Barfi experiences Bell's Palsy, a paralysis of facial muscles resulting from dysfunction of a cranial nerve. *Id.* at 1301.

        Walker-Barfi filed her SSI application on February 15, 2000. Her application was denied, initially and on reconsideration. Consequently, she requested and received a hearing before Administrative Law Judge Dale A. Garwal on May 10, 2001. Walker-Barfi was not represented by counsel. Walker-Barfi and her mother testified at the hearing; however, no medical personnel or vocational experts testified. On August 21, 2001, ALJ Garwal denied Walker-Barfi's application at step five of the sequential process used to assess benefits eligibility. Walker-Barfi requested review, but the Appeals Council denied the request on

August 11, 2004, making the ALJ's decision the final decision of the Commissioner. (Tr. at 3.) Walker-Barfi, who is now represented by counsel, then filed this case.

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), this court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and is based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). This court cannot reweigh evidence or substitute its judgment for that of the ALJ. *Binion on behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.* Such an error is committed if the ALJ fails to comply with the Commissioner's regulations and rulings. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The district court should remand the case if the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal

quotation marks omitted). However, a "sketchy opinion" may be sufficient if it is clear the ALJ considered the important evidence and his reasoning can be traced. *Id.* at 787.

Walker-Barfi raises three issues: (1) whether the waiver of her right to legal representation was valid; (2) whether the ALJ committed an error of law and failed to support his credibility determination with substantial evidence; and (3) whether the ALJ failed to support with substantial evidence his determination that Walker-Barfi retained the residual functional capacity to perform a significant number of jobs despite her impairments.

**A.      Waiver of Right to Representation**

A claimant has a statutory right to counsel at a disability hearing. 42 U.S.C. § 406; 20 C.F.R. 404.1700. If properly informed of this right, the claimant may waive it. *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). The claimant may waive the right if the ALJ first explains: (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency fee arrangement, and (3) the limitation on attorney's fees to twenty-five percent of past-due benefits with required court approval of the fees. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson*, 933 F.3d at 584. Specifically, the ALJ must state that attorney's fees are limited to twenty-five percent of the past due benefits. *See Binion*, 13 F.3d at 245 (finding that where an ALJ had not informed the claimant about the twenty-five percent cap, the ALJ failed to comply with the "clear dictates" of the waiver standard).

Walker-Barfi appeared at her May 10, 2001, hearing without an attorney. (Tr. at 180.) The ALJ addressed the representation issue as follows:

> ALJ:    . . . . Now, first of all, are you aware of your right to be represented at this hearing by an attorney or other qualified non-attorney representative?
>
> CLMT:   Yes, I am.

> ALJ: Secondly, are you familiar with Legal Aid? Do you know what that is or would you like me to explain to you what that is?
>
> CLMT: I'm familiar with it.
>
> ALJ: And finally, you should be aware of the fact that there are many attorneys, private attorneys, that take these cases on a contingency basis, meaning of course in the event you win your case, the attorney gets a fee subject to my approval to make sure you're not being overcharged, but if you don't win your case, you pay the attorney nothing. So we could do one of two things. We can either go ahead today without you being represented, or if it's your desire, I can give you another date to come back if you feel you'd rather come through this hearing with an attorney or other qualified non-attorney representative. It's up to you.
>
> CLMT: I'm going to go ahead and go through with it.

(*Id.* at 180-81.) Nowhere in this colloquy did the ALJ explain to Walker-Barfi the benefits of having an attorney – benefits such as questioning her in detail regarding her medical condition, obtaining a treating source assessment of her physical abilities, and making sure all her pertinent medical records were in the ALJ's file. Nowhere in this colloquy did the ALJ tell Walker-Barfi that there was any cap on a contingency fee, let alone a specific cap of twenty-five percent; he merely stated that the fee would be subject to court approval. Therefore, the ALJ did not meet two of the requirements for obtaining a valid waiver. Hence, Walker-Barfi's waiver was invalid.

However, an invalid waiver does not automatically require reversal. *Binion*, 13 F.3d at 245. Rather, the burden shifts to the Commissioner to show that the ALJ developed the record adequately. *Id.* The Commissioner must prove that the ALJ scrupulously and conscientiously probed, inquired of, and explored all relevant facts. *Id.* If the Commissioner meets the burden, a claimant has an opportunity to rebut this by demonstrating prejudice,

proving that the ALJ did not elicit all of the relevant information from the claimant, or establishing an evidentiary gap. *Id.*

To determine whether an ALJ's development of the record qualifies as "full and fair," the Seventh Circuit Court of Appeals has considered factors, including: (1) whether the ALJ obtained all of the claimant's medical and treatment records; (2) whether the ALJ elicited detailed testimony from the claimant at the hearing (probing into relevant areas, including medical evidence on the record, medications, pain, daily activities, the nature of all physical and mental limitations, etc.), and (3) whether the ALJ heard testimony from examining or treating physicians. *See, e.g., Binion*, 13 F.3d at 245 (outlining the ALJ's actions in Binion, which did qualify as full and fair development of the record). Although there is no hard and fast standard that delineates what is full and fair development of the record, "'a significant omission is usually required before this court will find that the Secretary failed to assist pro se claimants in developing the record fully and fairly.'" *Nelson v. Apfel,* 131 F.3d 1228, 1235 (7th Cir.1997).

In the case at bar, the court is not persuaded that the development of the record was full and fair. The transcript of the hearing before the ALJ is twenty-six pages, but only thirteen pages address Walker-Barfi's medical problems. Six of those pages are an unguided narrative by Walker-Barfi, and many of the questions in the remaining pages did not delve into material facts sufficiently. (*See* Tr. at 187-99.)

For example, the ALJ focused on the improvement in Walker-Barfi's condition. Yet, he asked only two questions regarding her future prognosis, neither of which elicited any detailed response from Walker-Barfi, possibly because the ALJ followed up the initial questions with his own suggested answers:

> Q     And what does the doctor say that he expects will occur in your case? You've had some improvement, right?

-5-

Case 2:04-cv-00973-CNC     Filed 08/31/05     Page 5 of 17     Document 18

> A   Yes.
>
> Q   Okay. And what does he think will occur? I mean, you'll have to pretty much live with us [sic] or he can't say, or –
>
> A   He pretty much said – basically what he said, this is what I'll have for the rest of my life and I will have to live with it.

(*Id.* at 195.)

Walker-Barfi testified that she had just finished taking Prednisone because her doctor wanted to see how she would do off of the drug. But she also said that "some of the things that [she] was going through have kind of increased again, and which like I said, believe would be the coughing that's coming and the severe night sweats." (*Id.* at 193.) The ALJ never asked Walker-Barfi if she needed to go back on Prednisone or would ask her doctor to put her back on it. Nor did the ALJ obtain testimony or other evidence from any treating or examining physicians regarding Walker-Barfi's improvement, whether such improvement translated into an ability to work, and the reason for tapering Prednisone. Even evidence already in the file indicates such information was necessary. In a letter from Dr. Glenn Ragalie to Dr. John Watt, dated March 21, 2000, Dr. Ragalie stated that Walker-Barfi's condition had "stabilized somewhat with prednisone therapy. However, she remains somewhat symptomatic." (*Id.* at 112.) The doctor added that reducing the Prednisone dose was important. (*Id.*) Hence, the ALJ should have developed the record regarding the reasons Prednisone was tapered, including whether it was because of side effects as opposed to Walker-Barfi's improvement and whether Walker-Barfi's symptoms would remain with Prednisone therapy.

With her initial brief in this court, Walker-Barfi submitted a letter of December 17, 2001, between Dr. Ragalie and Dr. Watt. Dr. Ragalie wrote that Watt had placed Walker-Barfi back on Prednisone in October 2001 and then opined that Walker-Barfi

needed much more aggressive therapy. (Pl.'s Br., Ex. B at 1-2.) While this letter post-dates the ALJ's hearing and decision, it indicates that Walker-Barfi's condition had not necessarily stabilized at an improved level and that the ALJ needed to inquire about Walker-Barfi's prognosis. *See Binion*, 13 F.3d at 246 ("Although the court cannot reverse the Secretary's decision on the basis of any new evidence introduced here, such evidence would weigh heavily in determining whether a remand [regarding an invalid waiver of counsel] is necessary.") The ALJ could not play doctor and interpret Walker-Barfi's improvements himself. Testimony or other evidence about her prognosis was necessary.

Similarly, the ALJ did not develop the record adequately regarding Walker-Barfi's use of her hands. In her Reconsideration Disability Report, Walker-Barfi stated that her hands shook constantly and that writing was difficult due to shaking and muscle pain. She advised that grasping small objects was difficult. (Tr. at 63.) Dr. Watt's notes of July 19, 2000, and April 24, 2001, indicate that Walker-Barfi complained of cramping and aches in her hands. (*Id.* at 125, 156.) Importantly, in his decision the ALJ found that Walker-Barfi had the residual functional capacity (RFC) to perform sedentary jobs existing in significant numbers in the national economy. (*Id.* at 17.) Unskilled sedentary work usually requires good use of hands and fingers, i.e. manual dexterity. SSR 83-14; SSR 96-9p. Yet, the ALJ asked only one question regarding Walker-Barfi's ability to use her hands:

> Q: How about your hands? Any problems?
>
> A: Joint pain because this disease attacks my joints, and since there are joints in my fingers and my wrists and elbows and joint pain.

(*Id.* at 199.) He did not follow-up with any questions regarding her abilities to grasp, turn, or otherwise manipulate objects using her hands. (*See id.*)

Further, the ALJ did not obtain all relevant medical evidence. Attached to Walker-Barfi's brief are several medical documents that do not appear in the Commissioner's transcript yet predate the ALJ's hearing. While several of the documents have little relevance, at least three should have been included in the ALJ's file. One is a physical examination form filled out by a Dr. Saedi on August 4, 2000, showing examination results of tenderness and pain all over Walker-Barfi's body and a medical impression of pulmonary sarcoidosis. (Pl.'s Br., Ex. C at 4.) One is a biopsy report of August 4, 2000, showing a node typical of sarcoidosis. (Pl.'s Br., Ex. C at 5.) Another is an August 11, 2000, progress note by Dr. Saedi on a follow-up from the biopsy. (Pl.'s Br., Ex. C at 2.) That these documents were missing from the ALJ's file supports this court's finding that the ALJ's record was not developed fully. Of course, the court is mindful that the ALJ asked Walker-Barfi to list her medical providers and that she did not mention Dr. Saedi. (*See* Tr. at 142.) However, an attorney likely would have made sure these records were provided to the ALJ.

In sum, the court finds that the Commissioner has not met her burden of showing that the ALJ developed the record adequately and that reversal is required based on the invalid waiver of representation. While the representation issue requires that the entire case be reconsidered by the ALJ, the court will also address Walker-Barfi's other arguments on appeal, as additional errors occurred and should not be repeated.

**B.    Credibility Analysis**

If medical evidence shows an impairment that could reasonably be expected to produce symptoms such as pain, the ALJ must evaluate the intensity and persistence of the symptoms to determine whether they limit the capacity for work. 20 C.F.R. § 416.929(c)(1). In evaluating the intensity and persistence of the symptoms, the ALJ must consider all available evidence, including medical history, medical evidence, the claimant's

statements, treating physician opinions, and statements from other persons about how the symptoms affect the claimant. *Id.*

An ALJ must consider a claimant's subjective complaints, if supported by medical signs and findings. *Clifford*, 227 F.3d at 871. But, even if not substantiated by objective medical evidence, a claimant's testimony about the intensity or persistence of pain or other symptoms or their effect on his ability to work is not rejected as a result. 20 C.F.R. § 416.929(c)(2); SSR 96-7p. "[S]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone . . . ." 20 C.F.R. § 416.929(c)(3). Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. SSR 96-7p. "'The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.'" *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

In evaluating credibility, the ALJ must comply with SSR 96-7p. *Brindisi*, 315 F.3d at 787. That ruling requires consideration of (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to

-9-

relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Further,

> [i]t is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, *quoted in Brindisi*, 315 F.3d at 787. A credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." SSR 96-7p.

The Seventh Circuit remanded *Clifford* for reconsideration of the claimant's credibility regarding her pain, as the ALJ had merely stated in conclusory fashion that Clifford's testimony was unsupported by medical evidence and inconsistent with her daily activities. The court of appeals found this explanation insufficient. 227 F.3d at 872. The court of appeals also remanded *Zurawski* for reconsideration of the claimant's credibility regarding pain. The ALJ had found the testimony regarding pain not entirely credible, citing inconsistencies with the objective medical evidence but not further explaining those inconsistencies. 245 F.3d at 887. Also, the ALJ had mentioned the findings of four physicians that the claimant could return to work, but failed to discuss MRI results supporting Zurawski's complaints and the medications he had used to relieve pain. *Id.* at 888. Because the Seventh Circuit was unable to tell whether the ALJ had examined all relevant evidence, it remanded for reevaluation by the ALJ. *Id.*

Walker-Barfi testified at the hearing before the ALJ that she was unable to bend over and pick up objects from the floor because she would become dizzy, and that swiveling her head caused dizziness. (Tr. at 189, 192.) She described trouble keeping her balance and severe sweating in a warm environment, which caused dizziness and nausea. (*Id.* at

189, 191.) Walker-Barfi stated that balance problems occurred daily and lasted for ten to twenty minutes at a time. (*Id.* at 196.) She had to lie down or sit motionless to resolve the dizziness and balance problems. (*Id.* at 192, 196-98.) Walker-Barfi testified further that her headaches had improved from daily occurrences, but that she still had headaches three to four times a week. (*Id.* at 191.) Continuing, she said the head pain was sometimes severe enough to make her cry and that medication did not relieve that pain. (*Id.* at 193-94.) Walker-Barfi recounted that generally she was in moderate joint pain all the time, with some severe episodes. (*Id.* at 193.) She stated that she did some house cleaning and cooking and watched some TV, but mostly read and stayed at home; she did not socialize. (*Id.* at 195-96.) Walker-Barfi added that she was susceptible to colds, which caused breathing difficulty. (*Id.* at 190.) And she stated that her doctors told her that each medication would not cure her problems, but simply slow them down. (*Id.* at 191.)

Walker-Barfi's mother testified as well, confirming all of Walker-Barfi's testimony. (*Id.* at 200.)

The ALJ here dealt with Walker-Barfi's credibility as follows:

> The claimant alleged that she is unable to: do any prolonged sitting, standing, or walking (more than ten or fifteen minutes each); lift more than five pounds; or do any significant bending, stooping or climbing. She added that she must avoid smoke and excessive heat. However, she indicated that she is still able to help with cooking and light housework.
>
> Upon a thorough review of the entire record, the undersigned Administrative Law Judge cannot credit the claimant's contention of disability. . . .

(*Id.* at 15.) The ALJ then described how the relevant medical evidence did not support Walker-Barfi's claims of disability:

> [T]he documentary evidence does not include any specific restrictions imposed by any of her treating physicians; instead, the record shows that since the date of her application for

> benefits, she actually has demonstrated definite improvement in her condition.
>
> On January 21, 2000, Dr. Glenn F. Ragalie noted that the claimant had displayed "substantial improvement with Prednisone therapy for apparent systemic sarcoidosis" (Exhibit 4F); Dr. Arthur J. Turner reported on August 28, 2000 that the claimant had already been functioning for a number of months on a significantly reduced level of Prednisone (Exhibit 6F); the progress notes in Exhibit 9F indicate that as of January 27, 2000, her Bell's palsy was "resolving"; and by April 24, 2001, she was "off Prednisone for sarcoidosis" and "off Nortriptyline" (for headaches; no other prescription pain medication was noted). Thus, the record shows that the claimant's aggressive treatment was tapered throughout the relevant period since the date of her application, and there has been steady improvement in the symptoms about which she has complained.
>
> . . . . There is no recent indication of any significant change in the improvement she has already demonstrated in her sarcoidosis and Bell's palsy.

(*Id.*) The ALJ concluded that Walker-Barfi does not

> suffer pain or any other symptoms that could be considered disabling in severity, particularly pursuant to the standards set forth in Social Security Rulings 96-3p and 96-7p, as well as 20 C.F.R. 416.929. In that regard, the undersigned especially emphasizes the claimant's current treatment regimen (which does not include any heavy prescription pain medication), along with the documented improvement in her overall condition (particularly with reference to her main diagnosed impairments).

(*Id.* at 16.)

As stated above, medical evidence is only one factor in evaluating a claimant's credibility. But here it is all that the ALJ referenced. The ALJ failed to discuss Walker-Barfi's daily activities, other than noting briefly that she helped with cooking and light housework. He failed to discuss the duration or frequency of Walker-Barfi's symptoms, even though she testified that balance problems occur daily and headaches occur three to four times a week. He failed to mention that heat precipitated symptoms, even though medical records documented such complaints. (*See id.* at 145 (noting that Walker-Barfi experienced "rapid

breathing if too warm"). Further, the ALJ failed to address the measures Walker-Barfi used to relieve the pain or other symptoms, such as lying down or sitting motionless. He did not discuss whether Walker-Barfi's complaints of headache pain were inconsistent with sarcoidosis, or detail how her previous use of Nortriptyline for head pain factored into his analysis. While noting the tapering of her medication, the ALJ did not discuss Walker-Barfi's testimony that medications did not alleviate her head pain in any event. (*See id.* at 193-94.)

Moreover, the ALJ must have credited Walker-Barfi's testimony in part regarding dizziness, as he found her unable to drive, yet did not state why he rejected her testimony regarding dizziness as it related to her ability to bend, stoop or remain balanced. Also, he did not address medical evidence that supported her claims of dizziness. A letter from Dr. Ragalie to Dr. Watt, dated March 21, 2000, for instance, states that Walker-Barfi "does continue to experience episodic vertigo and instability of her gate [sic]." (*Id.* at 112; *see also id.* at 162 (stating that Walker-Barfi "at times has dizziness").)

The ALJ did not discuss exactly why Walker-Barfi's complaints on these matters were rejected or even whether these symptoms are consistent with or contrary to relevant medical findings. Instead, he notes only that her use of drugs had been reduced, then eliminated, and that her symptoms had improved steadily. While the ALJ mentioned SSR 96-7p, he did so only in conclusory fashion by stating that its standards had been considered rather than actually addressing those standards in writing and explaining how Walker-Barfi's testimony was not fully credible. Thus, the ALJ did not build a logical bridge between the evidence and his conclusion.

Therefore, this court agrees with Walker-Barfi that the ALJ failed to adequately discuss the evidence in light of the SSR 96-7p standards and that the ALJ's credibility determination is not supported by substantial evidence.

## C.    Step-Five Analysis

The Administration has adopted a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4). Under this test, the ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment(s) meets or equals one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity; (4) if not, whether the claimant can perform his past relevant work; and (5) if not, whether the claimant can make the adjustment to other work based on his residual functional capacity (RFC). 20 C.F.R. § 416.920(a)(4); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant makes the necessary showing at steps one to three, she will be found disabled. If the impairment is not of such severity as to be presumptively disabling in the listings, the ALJ must consider at step four whether the claimant possesses the RFC to perform past work. If not, the burden shifts at step five to the Secretary to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *Young*, 362 F.3d at 1000.

The "medical-vocational guidelines" or "grids" are tables appended to Social Security Administration regulations regarding disability benefits. 20 C.F.R. pt. 404, subpt. P, app. 2; *see Zurawski*, 245 at 889. The grids are used at step five of the ALJ's sequential analysis. *See* 20 C.F.R. § 416.969; *Zurawski*, 245 F.3d at 889. They set forth various combinations of exertional RFC and vocational factors of age, education, and previous work experience, giving the resulting decision (disabled or not disabled) for someone with those characteristics. 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). If a claimant's

-14-

Case 2:04-cv-00973-CNC    Filed 08/31/05    Page 14 of 17    Document 18

characteristics match that of a grid precisely, the claim is determined as indicated in the rule. *Id.*; *accord* 20 C.F.R. § 416.969. If a claimant's characteristics vary from the grids because her RFC exertional limits do not fit into a category exactly or because nonexertional limitations exist, "a conclusion of disabled or not disabled is not directed." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(d). In such a case, the ALJ uses the grids only as a framework for decision. *Id.*; SSR 84-13.

The grids are based on "exertional" primary strength requirements of jobs, classifying them as sedentary, light, medium, heavy and very heavy. SSR 83-14; *see* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). The primary strength requirements consist of standing, walking, sitting, lifting, carrying, pushing, and pulling. SSR 83-14. "Any functional or environmental job requirement which is not exertional is 'nonexertional.'" *Id.* Climbing, stooping, and talking are examples of nonexertional requirements. *See id.* A person's nonexertional limitations "can affect the capacity to perform certain jobs at all levels of physical exertion. An entire range of jobs can be severely compromised." *Id.*

When a claimant cannot be found disabled based on exertional limitations alone, SSR 83-14 directs that the starting point for determining the person's ability to function is the grid rule corresponding to the claimant's vocational profile and her "maximum sustained exertional work capability." SSR 83-14; *accord* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2). That grid rule provides a framework for evaluating the additional impairments of a nonexertional nature. *See* SSR 83-14. The SSR advises that a vocational expert's testimony is helpful and sometimes necessary for making this determination. *Id.* Where the ALJ does not have a clear understanding of the effects of a nonexertional impairment on the job base, "the services of a VS [vocational specialist] will be necessary." *Id.*

Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying small items. 20 C.F.R. § 416.967(a). While a sedentary job involves sitting, occasional walking and standing are often necessary. *Id.* Where a claimant has nonexertional limitations that may restrict the sedentary occupational base, an RFC assessment "must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment." SSR 96-9p.

The ALJ found that Walker-Barfi could not perform a full range of sedentary work, as she was limited to jobs not involving driving, working at heights, or using dangerous machinery. (Tr. at 16.) Without any testimony from a vocational expert or any reference to an authoritative rule or written resource, the ALJ concluded that Walker-Barfi was "still able to perform the requirements of other appropriate sedentary jobs that exist in significant numbers in the national economy." (*Id.*) He used 20 C.F.R. pt. 404, subpt. P, app. 2, R. 201.27 of the grids as a framework and found Walker-Barfi not disabled. (*Id.*)

Reversal of the ALJ's attorney waiver and credibility findings impacts the step-five analysis. But, in addition, the ALJ's decision suffers from a lack of substantial evidence supporting the existence of a significant number of sedentary jobs in the economy that Walker-Barfi could perform.

The ALJ noted properly that the grids were used as a framework, and did not rely solely on Rule 201.27 for his decision. But he did not discuss adequately the effect of Walker-Barfi's nonexertional limitations on the number of sedentary jobs available. The ALJ did not mention how nonexertional limitations did or did not erode the range of work available to Walker-Barfi. SSR 96-9p states that hazards such as moving mechanical parts of equipment and working in high places are unusual in unskilled sedentary work and thus do

not result in a significant erosion of the occupational base, but here the ALJ does not cite to SSR 96-9p or any other authority and does not discuss at all the effect of the driving limitation on the occupational base. He failed to name even one occupation or job that was available to someone like Walker-Barfi, let alone how many positions for that job existed locally or even nationally. While a vocational expert's testimony is not always required pursuant to SSR 83-14, where the effects of a nonexertional impairment on the occupational base are unclear a vocational expert should be used. Where the extent of erosion of the occupational base is not clear, an ALJ may also consult written resources such as the Occupational Outlook Handbook or the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles. SSR 96-9p. Here, the ALJ did not state that he used any authority or resource at all to determine the remaining occupational base and did not discuss the effects of Walker-Barfi's limitations on the sedentary occupational base. He failed to create a logical bridge to his conclusion. Consequently, no substantial evidence exists on which the ALJ could rely for his decision.

Now, therefore,

**IT IS ORDERED** that this case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).

Dated at Milwaukee, Wisconsin, this 31st day of August, 2005.

BY THE COURT:

s/C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. District Judge